**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| AMY BURKES, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BAYLOR SCOTT & WHITE HEALTH; BENEFITS OPERATIONS COMMITTEE OF BAYLOR SCOTT & WHITE HEALTH; and JOHN AND JANE DOES 1-20, in their capacities as members of the Benefits Operations Committee of Baylor Scott & White Health,<br><br>Defendants. | Civil Action No.: 3:26-cv-03570<br><br>**CLASS ACTION COMPLAINT** |

Plaintiff Amy Burkes ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Baylor Scott & White Health ("BSWH"), the Benefits Operations Committee of Baylor Scott & White Health (the "Benefits Committee"), and the individual members of the Benefits Committee during the relevant period ("John and Jane Does 1-20") (collectively, "Defendants") based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation of counsel, review of Plan documents and participant-facing benefits materials, and review of public documents as to all other matters:

## <u>NATURE OF THE ACTION</u>

1. It is both unfair and unlawful for an employer to require employees to pay more for health coverage because they use tobacco unless the employer complies with ERISA's wellness-program requirements. BSWH does exactly that. Under the Baylor Scott & White Health Medical

and Welfare Benefits Plan (the "Plan"), employees who report tobacco use pay a $30 surcharge for each covered tobacco user, up to $60 per pay period. Because health and welfare deductions are normally taken from all 26 paychecks, the employee-only differential has an annual value of approximately $780. ERISA permits that health-based premium differential ***only if*** BSWH satisfies every condition of the wellness-program exception, including a compliant reasonable alternative standard, the same full reward, and the notice ERISA requires. *See* 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3)(C)-(E).

2. Tobacco surcharges have become more prevalent in recent years but to be lawful plans must make available a compliant "wellness program" that provides employees with a meaningful avenue to avoid the surcharge. Making a compliant wellness program available means employers must adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") over ten years ago in 2014. ERISA imbues the Departments with authority to promulgate regulations implementing ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments developed a regulatory framework that "must be satisfied" to qualify for the statutory exception. Employers can invoke that exception only by complying with all of its requirements.

3. ERISA's strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of wellness programs that are "subterfuge[s] for discriminating based on a health factor."[1] The Final Regulations establish that for plans to be compliant, an employer must provide a clearly defined, reasonable alternative

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

standard that allows participants to obtain the "full reward," including retroactive reimbursement of surcharges paid while completing the alternative standard; plans must also provide proper notice to all participants. *See id.*, 33159–63. First and foremost, a wellness program must be genuinely designed to improve health or prevent disease, rather than functioning as an improper penalty imposed on certain participants under the guise of a health initiative. Defendants' Plan imposes a tobacco surcharge while failing to offer compliant avenues to avoid the surcharge and failing to provide proper notice, in violation of ERISA.

4. BSWH's own participant-facing benefits materials illustrate the problem. *See* "Tobacco surcharge" Webpage, Ex. A at 7. BSWH asks employees and dependents about tobacco use during the preceding 12 months and imposes a $30 surcharge for each person identified as a tobacco user. To remove it, the materials say a participant must either complete "tobacco cessation wellness coaching" or have a physician certify that the participant "ha[s] quit using tobacco products." The materials then make clear that merely enrolling in the Tobacco Cessation Program does not stop the charge: the surcharge "will be applied until" the participant completes the program and submits a Tobacco Affidavit to PeoplePlace. Nothing in that description promises reimbursement of amounts already collected earlier in the Plan year.

5. The same materials also fail to give the notice ERISA requires. The Tobacco surcharge section does not state that a reasonable alternative standard or waiver is available to every affected participant, does not provide contact information for obtaining an individualized alternative, and does not state that recommendations from an individual's personal physician will be accommodated. Instead, the only physician language requires the physician to certify that the participant has already quit tobacco. That is materially narrower than telling participants that their

physician's recommendations concerning a reasonable alternative will be accommodated. *See* Ex. A at 7.

6. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings employers claim often result in cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[2] The regulatory safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and to promote genuine health improvements.

7. Outcome-based programs,[3] such as being tobacco-free or completing a smoking cessation program, must offer a clearly defined "*reasonable* alternative standard," which is an

---

[2] Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), Abstract (finding that tobacco surcharges are significant barriers to affordable health insurance).

[3] "An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward. . . if a wellness program tests individuals for specified medical conditions or risk factors . . . and provides a reward to individuals identified as within a normal or healthy range for these medical conditions or risk factors, while requiring individuals who are identified as outside the normal or healthy range (or at risk) to take additional steps . . . to obtain ***the same reward***" as the individual within the normal range. 29 C.F.R. § 2590.702(f)(1)(v) (emphasis added).

alternative way for "all similarly situated individuals" to obtain the reward (or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Critically, ERISA's implementing regulations require that "the *same*, *full reward*" must be provided to individuals who complete the alternative standard, regardless of when they do so during the plan year.[4] The Department of Labor ("DOL") has made clear that participants should not be forced to rush through the program under the threat of continued surcharges and that every individual participating in the program must receive the same reward as provided to non-smokers. *Id.* The Departments made this requirement clear when they stated it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual participating in the program*** should be able to receive ***the full amount of any reward or incentive*** . . .." *Id.*, 33160 (emphases added). Defendants violate these requirements by failing to make available a reasonable alternative standard that provides full reimbursement to "all similarly situated individuals" who complete it, operating a non-compliant penalty structure rather than a lawful wellness incentive, and failing to clearly notify participants of all the avenues available to them to avoid the surcharge, including benefit guides, plan documents, and summary plan descriptions ("SPDs"). *Id.* These failures constitute direct violations of ERISA's wellness program regulations.

8. Defendants cannot qualify for the statutory exception under 29 U.S.C. § 1182(b)(2)(B) and 42 U.S.C. § 300gg-4(j), because, although they impose a premium differential

---

[4] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

based on a health factor (tobacco use), the program fails to satisfy mandatory conditions of the exception. Compliance with each requirement in 29 C.F.R. § 2590.702(f)(4) is a precondition to lawfully charging the differential. Defendants' program fails on multiple, independent grounds: it does not make the same full reward available for the Plan year, and its Plan materials do not provide the prescribed notice.

9. The fiduciary allegations here concern more than the decision to establish a tobacco differential. BSWH is itself the Plan Administrator and has "ultimate responsibility for administering all plans." The Benefits Committee has "specific authority and duties in plan administration," discretionary authority to interpret Plan terms and resolve factual questions, and responsibility for "day-to-day administrative matters." SPD, Ex. B at 21–22. The challenged conduct includes the administration of the existing surcharge, the rules for stopping payroll deductions, the requirement that a Tobacco Affidavit be submitted to BSWH's PeoplePlace operation, participant communications about those rights, and the handling of the resulting participant contributions and Plan assets.

10. The Plan's funding structure makes the fiduciary issues concrete. The SPD identifies the Medical Plan as self-insured and expressly states that it is "Paid Through Welfare Trust." It further states that self-insured plans pay benefits from "separate trust funds set up for the exclusive benefit of participants." Medical coverage is paid with pre-tax payroll deductions, normally taken from all 26 paychecks. Thus, the tobacco-based amounts withheld from wages are identifiable participant contributions whose collection, custody, remittance, and use are subject to fiduciary duties once they become Plan assets. SPD, Ex. B at 12, 19, 31.

11. This Complaint does not depend on a theory that the Plan lacked enough money to pay claims. ERISA separately protects Plan assets and requires fiduciaries to act solely in

participants' interests. If tobacco-surcharge amounts were remitted to the Welfare Trust, Defendants were required to administer and use those trust assets only for permissible Plan purposes and not for their own account. If the amounts were retained outside the trust after they could reasonably be segregated from BSWH's general assets, the Plan was deprived of possession, use, and earnings on participant-derived Plan assets. In either event, ill-gotten profits made through fiduciary use of Plan assets are independently subject to restoration under ERISA § 409.

12. Participants like Plaintiff may challenge a surcharge when the plan does not satisfy the conditions that make health-based premium differences lawful. Plaintiff also challenges separate fiduciary conduct: Defendants' administration and communication of an existing Plan program, their control over when the surcharge stops, their handling of identifiable participant contributions, and their use or retention of Plan assets. Those are acts of Plan administration and asset control, not merely settlor decisions about whether a wellness program should exist.

13. Plaintiff is a current BSWH employee and Plan participant. BSWH charges her $30 every two weeks because of tobacco status. Her pay statements show the tobacco surcharge deduction. Plaintiff had never heard of any tobacco-cessation or wellness program through which she could avoid the surcharge, was never told that a reasonable alternative or waiver was available, and was never told that recommendations from her personal physician would be accommodated. She continues to suffer an actual monetary injury each pay period the surcharge is withheld.

## PARTIES

14. Plaintiff Amy Burkes is, and at all times mentioned herein was, an individual citizen of the State of Texas residing in Jarrell, Texas. Plaintiff is a current BSWH employee working in an Access Services financial counseling role. She participates in BSWH-sponsored medical coverage and is charged $30 every two weeks because BSWH treats her as a tobacco user.

15. Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

16. Defendant Baylor Scott & White Health is located in Dallas, Texas and sponsors the Plan. The SPD identifies BSWH itself as the Plan Administrator for all plans described in the SPD and states that the Plan Administrator has "ultimate responsibility for administering all plans." BSWH therefore acts as a named fiduciary when performing discretionary Plan-administration functions. Its Plan Administrator address is in Dallas, Texas. SPD, Ex. B at 21.

17. Defendant Benefits Operations Committee is identified in the Plan documents as a body consisting of BSWH employees and officers. The SPD gives the Benefits Committee "specific authority and duties in plan administration," discretionary authority to interpret Plan terms and resolve factual questions and uncertainties, and responsibility for advising on "day-to-day administrative matters." Its address is in Dallas, Texas. SPD, Ex. B at 22.

18. The identities of the individual members of the Benefits Committee during the relevant period are presently unknown to Plaintiff. Plaintiff therefore names them as John and Jane Does 1–20 and will amend this Complaint to identify and substitute the appropriate individuals when their identities are learned through discovery or otherwise.

19. At all times relevant to this lawsuit, BSWH sponsored and self-funded the Medical Plan, served as Plan Administrator, and acted as a fiduciary to the extent it exercised discretionary authority over Plan administration or authority or control over Plan assets. The Plan is an employee welfare benefit plan subject to ERISA pursuant to 29 U.S.C. § 1002(3). The SPD identifies the Medical Plan as self-insured, paid through a Welfare Trust, and governed under Plan ID 508. SPD, Ex. B at 19. As of December 31, 2024, the Plan had over 49,000 active participants, a portion of whom paid the tobacco surcharge.

## JURISDICTION AND VENUE

20. The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action seeks relief under ERISA, a federal statute.

21. This Court has personal jurisdiction over Defendants because BSWH serves as Plan Administrator from Dallas, Texas; maintains the Plan Administrator and legal-process address at 301 N. Washington Avenue in Dallas; and administers the Plan through BSWH officers, employees, and administrative operations in Texas. The Benefits Committee likewise is located in Dallas and performs discretionary Plan-administration functions there.

22. Venue is proper in the Northern District of Texas under 29 U.S.C. § 1132(e)(2), which permits an ERISA action to be brought in the district where the Plan is administered, where the alleged breach took place, or where a defendant resides or may be found. BSWH identifies Dallas as the address of the Plan Administrator, its agent for service of legal process, and the Benefits Committee. The acts and omissions giving rise to Plaintiff's claims, including Plan administration, participant communications, and fiduciary oversight of the challenged tobacco surcharge and Welfare Trust, occurred in substantial part in this District. Venue is therefore proper in this Court and the Dallas Division.

## FACTUAL BACKGROUND

### I. DEFENDANTS' TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

#### A. Statutory and Regulatory Requirements

23. ERISA prohibits any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater

than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

24. The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B) (emphases added)); however, these "wellness programs"—to qualify for this statutory safe-harbor exception—must strictly adhere to the mandated regulatory requirements.

25. Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. (29 U.S.C. § 1135). Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, which grants the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c; 42 U.S.C. §§ 300gg-4(n), 300gg-92.

26. Exercising this delegated authority, in 2006, the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments by the ACA and Public Health Service

Act in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 to be effective January 1, 2014. *Id.*, 33158.

27. The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163. "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge along with facts showing that the alternative standard offered to them is deficient, the burden then shifts to the employer to prove that the wellness program satisfies *all* the necessary criteria.

28. The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and they prevent employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," stating that a program "does not violate the provisions of this section ***only if <u>all</u> of the requirements are satisfied***.").

29. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii).

(c) Reasonable design: programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) an explicit statement that recommendations from participants' personal physicians will be accommodated. *See* § 2590.702(f)(4)(v).

30. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

31. Regarding the first criterion, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

32. A key requirement of the fourth criterion for outcome-based programs is that the "full reward" must be available to "all similarly situated individuals[,]" regardless of when they meet the reasonable alternative standard during the plan year. *See* Final Regulations, 33165. Critically, the Departments clearly state that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual*** participating in the program should be able to receive the ***full amount of any reward or incentive***. . . ." *Id.* (emphases added). While plans have flexibility in determining the manner in which they provide the "full reward," providing the "full reward" to every participant is ***mandatory***, regardless of when the participant satisfies the alternative standard. The Departments have made this clear:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphases added).

33. The Final Regulations provide an example of a non-compliant plan that imposes a tobacco use surcharge but does not facilitate the participant's enrollment in or participation in a smoking cessation program. *See id.*, Example 8. Instead, the employer advises the participant to find a program, pay for it, and provide a certificate of completion. *Id.* The Final Regulations conclude that the plan is not compliant because it "has not offered a reasonable alternative standard . . . and the program fails to satisfy the requirements of paragraph (f) of this section." *Id.*; Final Regulations, 33180.

34. For health-contingent wellness programs, the Final Regulations require the notice be disclosed "in ***all plan materials*** describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 45 C.F.R. § 146.121(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge participants more based on tobacco use and fail to provide the prescribed notice cannot invoke the wellness program exception.

## II. DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S WELLNESS PROGRAM EXCEPTION

35. BSWH's Tobacco Surcharge creates a premium differential based on tobacco use. Its current benefits materials state that an employee or dependent who reports tobacco use during the prior 12 months will pay an additional $30 for each covered tobacco user, up to $60 per pay

period. *See* Ex. A at 7. For an employee charged on 26 biweekly paychecks, the differential is approximately $780 each Plan year.

36. ERISA permits that health-based premium differential ***only if*** BSWH satisfies the requirements governing health-contingent wellness programs. *See* 29 U.S.C. § 1182(b)(2)(B); 29 C.F.R. § 2590.702(f)(4). Among those requirements, BSWH must make a reasonable alternative standard available, make the same full reward available to all similarly situated participants for the Plan year, and provide the notice prescribed by the regulation in all Plan materials describing the terms of the program.

37. That notice requirement is specific. Plan materials describing an outcome-based wellness program must disclose the availability of a reasonable alternative standard or waiver, provide contact information for obtaining the alternative, and state that recommendations from an individual's personal physician will be accommodated. 29 C.F.R. § 2590.702(f)(4)(v); *see also* 42 U.S.C. § 300gg-4(j)(3)(E).

38. BSWH's participant-facing Tobacco surcharge section does not provide that notice. It tells participants the amount of the surcharge and identifies two routes to prospective removal - completing tobacco cessation wellness coaching or obtaining a physician certification that the participant has quit. But it does not state that a reasonable alternative or waiver is available to every affected participant, does not provide contact information for obtaining an individualized alternative, and does not state that recommendations from a participant's personal physician will be accommodated. *See* Ex. A at 7.

39. The physician language is especially revealing. BSWH does not tell participants that it will accommodate their personal physician's recommendations. Instead, the physician is assigned a far narrower role: certifying that the participant "ha[s] quit using tobacco products."

That is an outcome certification, not notice that a physician may recommend a different reasonable alternative standard and that BSWH will accommodate the recommendation as required by the regulation.

40. ERISA's disclosure provisions reinforce the problem. An SPD must be written so that it is "sufficiently accurate and comprehensive to reasonably apprise" participants of their "rights and obligations under the plan." 29 U.S.C. § 1022(a). It must also describe the Plan's requirements concerning eligibility for benefits and circumstances that may result in disqualification, ineligibility, or denial or loss of benefits. *Id.* § 1022(b). Whether a participant must pay an additional $30 every pay period because of tobacco use, and what she must do to avoid that amount, directly affects her rights and financial obligations under the Plan.

41. BSWH's 174-page SPD does not cure the omission. Indeed, the SPD tells participants: "This SPD is your benefits resource. You should be able to find everything you need here." Ex. B at 3. Yet its entire "Wellness Programs" section merely states that BSWH offers "a variety of programs designed to support your mind, body, and spirit" and sends participants to a benefits website. *Id.* at 85. The SPD does not identify the tobacco surcharge, its amount, the cessation program, the Tobacco Affidavit, a reasonable alternative or waiver, or the required personal-physician accommodation.

42. The result is backwards. The website tells participants that tobacco status changes what they pay and that the surcharge continues until program completion and submission of an affidavit, but it omits the prescribed notice. The SPD—the document BSWH says should contain everything participants need—does not disclose the surcharge at all. A participant reviewing BSWH's Plan materials therefore is not told, in the manner ERISA requires, about the complete set of rights available to avoid a health-based charge.

43. Those omissions are not technicalities. The statutory exception permits BSWH to charge participants more because of a health factor only if the conditions governing the wellness program are satisfied. Section 2590.702(f)(4) provides that an outcome-based program does not comply unless all of its requirements are met. BSWH cannot impose the $30-per-pay-period differential while omitting one of the conditions that makes that differential lawful.

44. Plaintiff was subject to BSWH's Tobacco Surcharge during the Class Period. Her pay statements reflect $30 tobacco deductions throughout 2026 and earlier. Plaintiff had never heard of the Tobacco Cessation Program or wellness coaching and did not know that completing a program could stop the surcharge. She likewise was not told about a reasonable alternative or waiver or that recommendations from her personal physician would be accommodated.

45. The full reward defect is separate. BSWH states that merely enrolling in the Tobacco Cessation Program "will not prevent the tobacco surcharge from being applied" and that the surcharge "will be applied until" the program is completed and the Tobacco Affidavit is submitted to PeoplePlace. Ex. A at 7. BSWH's materials contain no mechanism for refunding the surcharges paid while a participant is completing the alternative. The program therefore provides, at most, prospective relief after completion, rather than the same full annual reward received by participants who satisfied the initial tobacco standard from the beginning of the Plan year.

## III. DEFENDANTS' FIDUCIARY ADMINISTRATION OF THE TOBACCO SURCHARGE AND PLAN ASSETS

46. BSWH is not merely the Plan sponsor. It is the Plan Administrator, with "ultimate responsibility for administering all plans." Ex. B at 21. The Benefits Committee consists of BSWH employees and officers, has "specific authority and duties in plan administration," possesses discretionary authority to interpret Plan terms and resolve factual questions, and is responsible for

"day-to-day administrative matters." *Id.* at 22. Those grants of authority concern the administration challenged here.

47. The surcharge removal process itself is administered through BSWH. The participant-facing materials say the surcharge continues until the employee completes the Tobacco Cessation Program and submits a Tobacco Affidavit to PeoplePlace. Ex. A at 7. The SPD states that "Baylor Scott & White Health has established PeoplePlace to aid you with your benefit plans" and that PeoplePlace provides detailed Plan information and permits benefit changes. Ex. B at 22. Deciding whether a participant has satisfied the existing surcharge-removal requirements and stopping payroll deductions therefore involve Plan administration, not merely Plan design.

48. The Plan's funding structure also makes the handling of tobacco-surcharge deductions a fiduciary matter. BSWH's Medical Plan is expressly identified as "Self-Insured" and "Paid Through Welfare Trust." Ex. B at 19. The SPD further states that plans described as self-insured "pay benefits from separate trust funds set up for the exclusive benefit of participants." *Id.* at 31.

49. Participant medical contributions are collected through payroll. The SPD states that health and welfare deductions are normally taken from all 26 paychecks, that enrollment authorizes BSWH to take pre-tax payroll deductions, and that coverage is paid with pre-tax dollars. Ex. B at 12. Plaintiff's pay statements confirm that BSWH withholds the challenged surcharge directly from wages as part of the recurring payroll process.

50. The relationship is concrete and traceable. Plaintiff paid surcharges throughout the year. The same payroll, PeoplePlace, trust, and accounting systems identify the surcharge amounts withheld from each Class Member, the dates of withholding, whether and when each amount was

remitted to the Welfare Trust, and how those amounts were held, invested, credited, or used. Those records are in Defendants' possession.

51. Participant contributions withheld from wages for contribution to an ERISA welfare plan become Plan assets as of the earliest date on which they can reasonably be segregated from the employer's general assets. 29 C.F.R. § 2510.3-102(a)(1), (c). Accordingly, once tobacco-surcharge amounts withheld from participant wages became Plan assets, any person exercising authority or control over their disposition acted as a fiduciary with respect to those assets.

52. If BSWH remitted the tobacco surcharge contributions to the Welfare Trust, those amounts became identifiable trust assets required to be held for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan. Defendants could not use their control over the Trust or the surcharge-removal process to deal with those assets in BSWH's own interest or for BSWH's own account. If, instead, BSWH retained participant contributions outside the Trust beyond the point at which they could reasonably be segregated, the Plan lost possession and use of those assets and BSWH obtained the corresponding use and time value of Plan money.

53. The Plan-level harm is therefore not limited to whether the Trust ultimately had enough money to pay medical claims. ERISA § 409 separately requires a breaching fiduciary to restore profits made through use of Plan assets. Where a fiduciary uses the mechanics of a self-funded plan and control over participant-derived Plan assets to generate a financial benefit for itself, the misuse and resulting profit are independently actionable even if the Plan remains solvent.

54. The precise disposition of the tobacco-surcharge funds and the amount of any gain are uniquely within Defendants' possession. Relevant records include payroll data showing each tobacco deduction, PeoplePlace and Tobacco Affidavit records showing when surcharges were

stopped, trust and bank records showing deposits and transfers, Plan funding records, and records reflecting any earnings, float, offsets, or other financial benefits realized through the participant-derived amounts. Discovery and an accounting will establish the full amount of Plan assets and profits at issue.

## CLASS DEFINITION AND ALLEGATIONS

55. Plaintiff brings this action individually and on behalf of all other similarly situated individuals pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

56. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
> All individuals residing in the U.S. who, during the relevant period, paid a premium differential based on tobacco-use status in connection with their participation in the Plan.

57. Excluded from the Class are Defendants' officers and directors.

58. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

59. **Numerosity**. This action is appropriately suited for a class action. BSWH applies the Tobacco Surcharge to employees and covered dependents who report tobacco use, at $30 per person per pay period. Upon information and belief, the proposed Class contains at least hundreds and likely thousands of Plan participants. Their identities, tobacco surcharge deductions, and program records are readily ascertainable from BSWH's payroll and PeoplePlace systems.

60. **Commonality**. This action involves questions of law and fact common to the Class. The common questions include, among others:

a. whether BSWH's Tobacco Surcharge creates a premium differential based on a health-status-related factor;

b. whether BSWH made the same full reward available to all similarly situated participants who satisfied a reasonable alternative standard;

c. whether BSWH's practice of continuing the surcharge until completion of wellness coaching and submission of a Tobacco Affidavit, without a disclosed retroactive reimbursement mechanism, satisfies 29 C.F.R. § 2590.702(f)(4)(iii)-(iv);

d. whether BSWH provided the required notice in all Plan materials describing the terms of the Tobacco Surcharge, including the required personal-physician accommodation statement;

e. whether BSWH, the Benefits Committee, and other fiduciaries breached fiduciary duties in administering the Tobacco Surcharge, PeoplePlace removal process, participant communications, and participant-derived Plan assets;

f. whether Defendants failed to prudently review the Tobacco Surcharge, the reasonable-alternative process, payroll administration, trust handling, and participant communications to ensure compliance with ERISA and the Plan's exclusive-purpose requirements;

g. the appropriate mechanisms to determine Class-wide restitution, equitable surcharge, accounting, and disgorgement or restoration of profits made through use of Plan assets;

61. **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class because she was subject to BSWH's uniform Tobacco Surcharge and paid more for BSWH-sponsored coverage. Plaintiff advances the same claims and legal theories on behalf of herself and the Class, and the principal questions concerning BSWH's uniform Plan terms, notices, payroll administration, PeoplePlace process, and handling of participant contributions can be resolved with common proof.

62. **Adequacy of Representation**. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a current BSWH employee, participates in BSWH-sponsored coverage, and is harmed by the same surcharge and fiduciary conduct challenged on behalf of the Class. Plaintiff has retained counsel experienced in complex ERISA and class action litigation. Plaintiff has no interests antagonistic to the Class, and Defendants have no defenses unique to Plaintiff that defeat adequacy.

63. Plaintiff seeks injunctive, declaratory, restitutionary, and other equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendants may continue collecting the challenged surcharge and administering the Plan under deficient disclosures while current participants continue to bear increased payroll deductions. Class-wide relief will permit the Court to address the uniform Plan terms, participant communications, surcharge-removal practices, and fiduciary handling of participant-derived Plan assets in a single proceeding.

## CAUSES OF ACTION

## COUNT I

### UNLAWFUL PREMIUM DIFFERENTIAL - FAILURE TO PROVIDE A COMPLIANT REASONABLE ALTERNATIVE STANDARD AND FULL REWARD

(Violation of ERISA § 702, 29 U.S.C. § 1182(b), and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(C)-(D); 29 C.F.R. § 2590.702(f)(4)(iii)-(iv); 45 C.F.R. § 146.121(f)(4)(iii)-(iv))

64. Plaintiff re-alleges and incorporates herein by reference allegations 1–63 of this Complaint.

65. ERISA prohibits group health plans from requiring participants to pay more for coverage based on a health-status-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). BSWH's Tobacco Surcharge causes a participant identified as a tobacco user to pay $30 more each pay period for the same medical coverage and is therefore unlawful unless BSWH satisfies every condition of the statutory and regulatory exception for health-contingent wellness programs. 29 U.S.C. § 1182(b)(2)(B); 42 U.S.C. § 300gg-4(j)(3); 29 C.F.R. § 2590.702(f)(4).

66. Among those mandatory conditions, an outcome-based program must be reasonably designed to promote health and must make the full reward available to all similarly situated individuals through a reasonable alternative standard. 42 U.S.C. § 300gg-4(j)(3)(C)-(D); 29 C.F.R. § 2590.702(f)(4)(iii)-(iv). The same full reward must remain available even when a participant needs time during the Plan year to request, establish, and satisfy the alternative.

67. BSWH's published rules do not provide that full reward. The current materials state that enrollment in the Tobacco Cessation Program does not prevent the surcharge from being applied and that the charge continues until the participant has completed the program and submitted a Tobacco Affidavit to PeoplePlace. Ex. A at 7. The materials do not say that BSWH returns or credits the surcharge amounts collected before completion.

68. That structure produces unequal annual premium costs among similarly situated participants. A participant who reports no tobacco use at the beginning of the Plan year receives the entire $780 annual employee-only reward. A participant who completes BSWH's cessation coaching during the year receives only the value of future payroll deductions that have not yet occurred, while the surcharge amounts collected during the months spent satisfying the alternative remain unreimbursed. ERISA requires the same, full reward for the Plan year, not merely a prospective partial reward.

69. BSWH's physician pathway also does not identify a flexible individualized alternative. The materials say only that a physician may certify that the participant "ha[s] quit using tobacco products." They do not state that BSWH will accommodate a physician's recommendation for another reasonable alternative standard or waiver. To the extent Defendants administer the program as limiting participants to these two listed paths, the program is more restrictive than the regulatory framework permits.

70. Because BSWH imposed the tobacco-based differential without making the same full reward available to all similarly situated participants who satisfy a reasonable alternative standard, and because its published physician process does not disclose or provide the individualized accommodation required by the regulation, BSWH cannot invoke ERISA's wellness-program exception.

71. The resulting Tobacco Surcharge is therefore an unlawful difference in the cost of coverage based on a health-related factor, in violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b).

72. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to enjoin practices that violate ERISA and to obtain other appropriate equitable relief to redress such violations or enforce ERISA. Plaintiff and Class Members therefore seek appropriate equitable relief, including restitution of identifiable surcharge payments, equitable surcharge, disgorgement, an accounting, declaratory and injunctive relief, and other relief necessary to redress Defendants' violations.

## COUNT II
## UNLAWFUL PREMIUM DIFFERENTIAL - FAILURE TO PROVIDE REQUIRED NOTICE
**(Violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v))**

73. Plaintiff re-alleges and incorporates herein by reference allegations 1–72 of this Complaint.

74. ERISA prohibits group health plans from requiring participants to pay more for coverage based on a health-status-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). BSWH's Tobacco Surcharge imposes a tobacco-based premium differential and is therefore unlawful unless BSWH satisfies every condition of the statutory and regulatory exception for health-contingent wellness programs.

75. One of those conditions is notice. BSWH was required to disclose the availability of a reasonable alternative standard or waiver in all Plan materials describing the terms of the Tobacco Surcharge. 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v).

76. The required notice must identify the availability of a reasonable alternative standard or waiver, provide contact information for obtaining it, and state that recommendations of a participant's personal physician will be accommodated. 29 C.F.R. § 2590.702(f)(4)(v). Those disclosures must appear in all Plan materials describing the terms of the outcome-based program.

77. BSWH's participant-facing medical materials describe the Tobacco Surcharge in concrete terms. They say that a participant who reports tobacco use during the preceding 12 months pays $30 per tobacco user each pay period, up to $60 per pay period, and that completion of tobacco cessation wellness coaching or a physician certification of quitting can remove the charge. *See* Ex. A at 7.

78. But the section describing that differential omits the notice ERISA requires. It does not say that a reasonable alternative or waiver is available to every affected participant, does not provide contact information for obtaining an individualized alternative, and does not state that recommendations from a participant's personal physician will be accommodated. A bare "Quit tobacco" link does not supply the missing physician-accommodation statement or tell a participant that individualized alternatives and waivers are available.

79. The physician-certification language does not cure the problem. Asking a doctor to certify that the participant has already quit tobacco is not the same as telling the participant that the Plan will accommodate recommendations made by the participant's personal physician concerning a reasonable alternative standard. The distinction matters because the latter is a mandatory disclosure in Plan materials describing an outcome-based program.

80. Nor does the SPD cure the omission. BSWH calls the SPD the participant's "benefits resource" and says participants "should be able to find everything you need here." Ex. B at 3. Yet the SPD does not identify the Tobacco Surcharge at all. Its entire "Wellness Programs"

section consists of a general statement that BSWH offers programs supporting "mind, body, and spirit" and directs participants to a website. *Id.* at 85. It contains none of the surcharge-specific notice required by § 2590.702(f)(4)(v).

81. General PeoplePlace contact information elsewhere in the SPD cannot substitute for the prescribed notice. Section 2590.702(f)(4)(v) requires the notice in the Plan materials that describe the terms of the outcome-based wellness program. A participant reading that BSWH will take $30 from each paycheck because of tobacco status should not have to infer that an undisclosed statutory alternative might exist or guess that a general HR telephone number can be used to obtain it.

82. BSWH's notice failure independently prevents it from invoking the wellness program exception. The exception applies only if the applicable requirements are satisfied. BSWH cannot impose a health-based premium differential, describe when the surcharge will be taken and stopped, and omit the disclosures Congress and the Departments made a condition of that differential.

83. Because BSWH did not provide the prescribed reasonable alternative notice in the Plan materials describing the Tobacco Surcharge, the resulting differential is an unlawful difference in the cost of coverage based on a health-status-related factor, in violation of 29 U.S.C. § 1182(b) and 42 U.S.C. § 300gg-4(b).

84. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes Plaintiff and Class Members to seek appropriate equitable relief to enjoin BSWH's unlawful practices, redress the violations, and enforce ERISA. Plaintiff and Class Members therefore seek restitution of identifiable surcharge payments, disgorgement, equitable surcharge, an accounting, declaratory and injunctive relief, and such other appropriate equitable relief as the Court deems just and proper.

**COUNT III**
**BREACH OF FIDUCIARY DUTY (PLAN-LEVEL RELIEF)**
**(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109; Brought Under 29 U.S.C. § 1132(a)(2))**

85. Plaintiff re-alleges and incorporates by reference all preceding allegations concerning BSWH's Tobacco Surcharge, the administration of that differential by BSWH and the Benefits Committee, the participant contributions generated by it, the Welfare Trust through which the self-insured Medical Plan is funded, and Defendants' control over or use of Plan assets.

86. BSWH is the Plan Administrator and a fiduciary of the Plan when it performs discretionary administrative functions. The SPD states that BSWH has "ultimate responsibility for administering all plans." Ex. B at 21. The Benefits Committee likewise has "specific authority and duties in plan administration," discretionary authority to interpret Plan terms and resolve factual questions, and responsibility for "day-to-day administrative matters." *Id.* at 22.

87. Accordingly, upon information and belief, BSWH and the Benefits Committee exercised fiduciary authority over administration of the Tobacco Surcharge, including participant communications, the cessation-program and physician-certification process, the requirement that a Tobacco Affidavit be submitted to PeoplePlace, determinations of when a surcharge is removed, and the payroll instructions implementing those determinations. The surcharge-removal process expressly requires action through PeoplePlace, an operation BSWH established to administer employee benefit plans.

88. BSWH and the Benefits Committee also acted as fiduciaries to the extent they exercised authority or control over Plan assets. The Medical Plan is self-insured, is paid through a Welfare Trust, and pays benefits from a separate trust fund established for the exclusive benefit of participants. Ex. B at 19, 31. U.S. Bank serves as Trustee. *Id.* at 21. The Tobacco surcharge

deductions are participant contributions collected through BSWH's payroll system in connection with Plan medical coverage.

89. Upon information and belief, BSWH appoints, retains, or otherwise controls the BSWH employees and officers who serve on the Benefits Committee. To the extent BSWH had authority to appoint or remove those fiduciaries, it had a duty to monitor their administration of the Plan, including the Tobacco Surcharge, PeoplePlace processes, participant communications, and treatment of participant-derived Plan assets.

90. ERISA required BSWH, the Benefits Committee, and the individual fiduciaries, when acting in their fiduciary capacities, to act solely in the interests of participants and beneficiaries, for the exclusive purpose of providing benefits and defraying reasonable Plan expenses, with the care, skill, prudence, and diligence of prudent fiduciaries, and in accordance with the documents governing the Plan. 29 U.S.C. § 1104(a)(1). ERISA separately prohibits a fiduciary from dealing with Plan assets in its own interest or for its own account. Id. § 1106(b)(1).

91. The conduct challenged in this Count concerns fiduciary administration and asset control, not the settlor decision to create or price a tobacco surcharge. Defendants implemented the existing surcharge, determined when payroll deductions would cease, required completion documentation through PeoplePlace, communicated—or failed to communicate—participants' rights under the program, and exercised authority or control over participant contributions after they were withheld from wages.

92. Participant contributions withheld from wages for contribution to a welfare plan become Plan assets as of the earliest date on which they can reasonably be segregated from the employer's general assets. 29 C.F.R. § 2510.3-102(a)(1), (c). Plaintiff's pay statements show the

dollar amounts deducted from her paycheck. Once those and comparable Class Member deductions became Plan assets, fiduciary duties attached to their custody and disposition.

93. Unlike an arrangement in which a sponsor merely pays benefits from unrestricted corporate assets, BSWH's own Plan documents identify an actual Welfare Trust. The Plan is "Self-Insured," the Plan Details chart answers "Yes" to "Paid Through Welfare Trust," and the SPD states that self-insured plans pay benefits from "separate trust funds set up for the exclusive benefit of participants." SPD, Ex. B at 19, 31. Those express terms identify a concrete asset pool against which the participant contributions and tobacco surcharge deductions must be properly accounted for. Upon information and belief, the relevant payroll and trust records will show the timing and amount of any remittances to that pool.

94. If the tobacco surcharge deductions were remitted to the Trust, Defendants exercised fiduciary control over identifiable Plan assets. They could not cause those trust assets to be used for BSWH's own account, to satisfy an obligation that properly belonged to BSWH rather than the Plan, or otherwise to generate a corporate benefit inconsistent with the exclusive-purpose rule. If BSWH instead retained participant contributions outside the Trust after the funds could reasonably be segregated, that retention deprived the Plan of possession and use of its assets and gave BSWH the use and time value of Plan money.

95. Either path presents a fiduciary accounting question based on records Defendants control, not speculation about Plan solvency. Payroll records identify the deductions; trust and bank records identify whether and when they were deposited; funding records identify how Plan expenses were financed; and accounting records identify whether BSWH received avoided expenditures, retained cash, float, interest, investment return, offsets, credits, reimbursements, or other economic benefits through use or retention of participant-derived Plan assets.

96. BSWH and the Benefits Committee also breached their fiduciary duties in administering and communicating the Tobacco Surcharge. The SPD places ultimate administrative responsibility on BSWH and day-to-day administrative responsibility and discretionary interpretive authority on the Benefits Committee. Yet the core SPD omits the surcharge entirely, while the participant-facing surcharge material tells employees they will pay more but omits the required personal-physician accommodation and full reward information. Permitting participants to continue paying increased contributions under materially incomplete Plan communications is fiduciary conduct when undertaken by the fiduciaries responsible for administering those existing Plan terms.

97. To the extent Defendants contend that participants had access to individualized alternatives, waivers, physician-directed accommodations, retroactive reimbursement, or other rights not disclosed in the participant-facing materials, the fiduciaries failed to administer and communicate those rights prudently. A Plan Administrator with ultimate responsibility for Plan administration and a Benefits Committee responsible for day-to-day administrative matters could not prudently allow employees to incur recurring payroll deductions while the means of invoking their rights to avoid those deductions remained undisclosed or inadequately explained.

98. Upon information and belief, the Benefits Committee further failed to conduct a prudent and periodic review of the Tobacco Surcharge, the cessation program and physician process, the Tobacco Affidavit and PeoplePlace workflow, participant communications, payroll deductions, and the manner in which participant contributions were remitted to and handled by the Trust. Those failures permitted the challenged practices and participant payments to continue from pay period to pay period for years.

99. BSWH separately breached its fiduciary duties to the extent it failed to prudently monitor the Benefits Committee and other fiduciaries to whom it delegated administrative responsibility. BSWH knew or should have known that its own Plan Administrator, Benefits Committee, PeoplePlace operation, payroll system, and Trust were being used to administer a tobacco-based contribution differential. It nevertheless failed to ensure that the program was periodically reviewed for ERISA compliance, that participant communications were corrected, that the full reward was administered, and that participant-derived Plan assets were handled solely for permissible Plan purposes.

100. These failures are particularly significant because the Plan's structure gives BSWH access to information and control at every relevant stage: BSWH is Plan Administrator; its employees and officers comprise the Benefits Committee; it established PeoplePlace; it withholds the surcharge through payroll; and its Medical Plan is funded through a Trust. Further, Defendants have every incentive to ensure participants do not learn about ways to avoid the surcharge. Defendants cannot characterize the challenged conduct as merely a plan design decision when the alleged breaches arise from the way existing Plan terms and Plan assets were actually administered.

101. These acts violated ERISA's duties of loyalty and prudence. Defendants exercised discretionary administrative authority over the Tobacco Surcharge and the process for removing it, controlled or influenced the communications that informed participants of their Plan rights, and exercised authority or control over participant-derived assets after the amounts were withheld from wages. 29 U.S.C. § 1104(a)(1).

102. The challenged conduct also constituted prohibited transactions to the extent Plan assets were caused to be used for the benefit of a party in interest— namely, BSWH—in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), or fiduciaries dealt with Plan assets in

BSWH's interest or for BSWH's account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1). The precise transaction path is reflected in payroll and Trust records uniquely within Defendants' control.

103. ERISA does not permit a fiduciary to retain profits from misuse of Plan assets merely because the Plan ultimately had sufficient resources to pay claims. Section 409 separately makes a breaching fiduciary liable to make good losses to the Plan and to restore profits made through the use of Plan assets. 29 U.S.C. § 1109(a). The Plan's injury therefore includes any loss of use, earnings, or possession of participant contributions and any fiduciary profit or other benefit generated through misuse of Plan assets, whether or not the Plan was otherwise solvent.

104. As a result of these breaches, the Plan suffered harm and Defendants obtained profits or other financial benefits to the extent participant-derived Plan assets were retained outside the Trust, used for BSWH's own account, used to discharge obligations that otherwise belonged to BSWH, or otherwise administered contrary to the Plan's exclusive-benefit trust structure. The amount of any lost earnings, retained cash, float, avoided expenditure, or other profit can be determined through an accounting.

105. BSWH and the Benefits Committee maintain or control the records necessary to determine the Plan-level loss and fiduciary gain, including the Trust agreement, bank records, payroll data showing tobacco-surcharge contributions, records showing when contributions were deposited and held, Plan expense and funding records, and records reflecting transfers, earnings, or reimbursements. Those records will establish the disposition of the surcharge proceeds and any profits made through their use.

106. Plaintiff is authorized to bring this action in a representative capacity on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2). Under 29 U.S.C. § 1109(a), a breaching fiduciary is

personally liable to make good losses to the Plan, restore profits made through the use of Plan assets, and provide such other equitable or remedial relief as the Court deems appropriate. Plaintiff therefore seeks restoration and disgorgement of fiduciary profits, recovery of any Plan losses, an accounting, removal or replacement of fiduciaries if appropriate, and all other Plan-wide relief authorized by §§ 1109 and 1132(a)(2).

**COUNT IV**
**BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)**
**(Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106; Brought Under 29 U.S.C. § 1132(a)(3))**

107. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein, including the allegations concerning BSWH's and the Benefits Committee's fiduciary status, administration of the Tobacco Surcharge, control over PeoplePlace and participant communications, handling of participant contributions and Welfare Trust assets, and BSWH's monitoring responsibilities.

108. BSWH was the Plan Administrator with ultimate responsibility for Plan administration. The Benefits Committee consisted of BSWH employees and officers and had specific administrative duties, discretionary interpretive authority, and responsibility for day-to-day administrative matters. Upon information and belief, both exercised fiduciary authority over administration of the Tobacco Surcharge and the participant communications and payroll processes through which it was imposed and removed.

109. BSWH and the Benefits Committee breached their duties of loyalty and prudence by administering and communicating the Tobacco Surcharge in a manner that caused Plaintiff to pay more for Plan coverage without receiving the information ERISA required concerning her reasonable-alternative, full reward, and personal-physician rights. Plaintiff was never told about

the Tobacco Cessation Program at all, even though BSWH deducted hundreds of dollars from her wages throughout 2026.

110. To the extent Defendants contend that Plaintiff could have obtained an individualized alternative, physician-directed accommodation, waiver, retroactive reimbursement, or other relief through a process not adequately disclosed in BSWH's Plan materials, the fiduciaries failed to administer and communicate those rights prudently. Plaintiff was not adequately told how to invoke such a process, whom to contact for an individualized alternative, or that recommendations from her personal physician would be accommodated.

111. BSWH separately breached its fiduciary duties to the extent it failed to prudently monitor the Benefits Committee and other delegated fiduciaries. BSWH knew or should have known that the Tobacco Surcharge increased participant medical contributions through recurring payroll deductions, that PeoplePlace was used to determine when those deductions stopped, and that the Plan materials describing the process omitted material information. BSWH nevertheless failed to ensure that those communications and administrative practices were corrected.

112. Those failures directly harmed Plaintiff. Because BSWH treated Plaintiff as subject to the Tobacco Surcharge, it withheld $30 from her pay every two weeks. Plaintiff lost possession and use of those specific amounts and continues to incur the same recurring deduction while she remains employed and enrolled.

113. The disputed amounts are not an abstract monetary damages theory. The surcharge deductions are specifically identifiable through Plaintiff's pay statements and BSWH's payroll records, and their disposition is traceable into the Plan's Trust or any account in which BSWH held them before remittance. The SPD confirms that the self-insured Plan is paid through a Welfare Trust. Ex. B at 19, 21, 31.

114. Plaintiff therefore seeks equitable relief directed to identifiable funds and gains, including restitution or an equitable lien or constructive trust over traceable surcharge amounts or their proceeds, an accounting for where those amounts were deposited and how they were used, disgorgement of profits attributable to their possession or use, and equitable surcharge for losses caused by fiduciary misrepresentations and omissions. The relevant tracing and accounting information is uniquely within Defendants' control.

115. The same administrative conduct supports prospective relief. Plaintiff is a current employee who continues to be subject to the $30 biweekly deduction. Unless corrected, the fiduciaries will continue administering the Tobacco Surcharge through deficient communications and a process that does not make the full reward and required physician rights clear. Injunctive and declaratory relief are therefore necessary to prevent ongoing fiduciary harm.

116. Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff and the Class seek appropriate equitable relief necessary to redress these fiduciary breaches and enforce ERISA, including restitution of traceable funds, equitable surcharge, disgorgement, an accounting for profits, the imposition of a constructive trust or equitable lien over traceable surcharge amounts or profits where appropriate, declaratory and injunctive relief, and such other appropriate equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. An Order certifying this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that BSWH's tobacco-based premium differential violates ERISA's anti-discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order requiring Defendants to reimburse or credit Class Members for amounts by which they paid more for medical coverage under a tobacco-based differential that did not satisfy the conditions of ERISA's wellness program exception;

D. A declaratory judgment that Defendants breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104 by, *inter alia*, administering the "Tobacco surcharge," PeoplePlace removal process, participant communications, payroll deductions, and participant-derived Plan assets imprudently or disloyally, and by failing to adequately monitor the program and Trust administration;

E. An Order requiring Defendants to provide an accounting of all tobacco surcharge deductions, all contributions attributable to the tobacco differential, the dates and accounts into which those amounts were deposited, the Trust's receipt and use of those funds, and all profits or other financial benefits obtained through their possession or use;

F. Declaratory and injunctive relief as necessary and appropriate;

G. Disgorgement of any benefits, profits, avoided expenditures, float, or other financial benefits Defendants received or enjoyed through misuse or retention of participant-derived Plan assets;

H. Restitution of the amounts by which Plaintiff and Class Members paid more for medical coverage because of the challenged Tobacco Surcharge, including through an equitable lien or constructive trust over traceable funds where appropriate;

I. Equitable surcharge from Defendants totaling losses caused by fiduciary breaches and/or unjust enrichment obtained as a result of those breaches;

J. Relief to the Plan under 29 U.S.C. §§ 1109 and 1132(a)(2), including recovery of Plan losses, disgorgement and restoration of any profits made through use of Plan assets, an accounting, removal or replacement of fiduciaries if appropriate, and all other equitable or remedial relief the Court deems appropriate;

K. An award of pre-judgment interest on any amounts awarded to Plaintiff, the Class, or the Plan pursuant to law;

L. An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common-fund doctrine, and/or other applicable doctrine;

M. Any other relief the Court determines is just and proper.

Dated: October 12, 2026

Respectfully submitted,

*/s/ Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
214-744-3000 / 214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com

**SIRI & GLIMSTAD LLP**
Oren Faircloth (*pro hac vice* forthcoming)
William H. Payne (*pro hac vice* forthcoming)
745 Fifth Avenue, Suite 500
New York, NY 10151
Tel: (929) 677-5181
E: ofaircloth@sirillp.com
E: wpayne@sirillp.com

***Attorneys for Plaintiff and the Proposed Class***